HARRISON STATE BANK, Appellant, *v.* UNITED STATES FIDELITY & GUARANTY CO. et al., Respondents.

(No. 7,031.)

(Submitted April 8, 1933. Decided April 13, 1933.)

[22 Pac. (2d) 1061.]

*Mr. Lester H. Loble* and *Mr. Hugh R. Adair*, for Appellant, submitted an original and a reply brief; *Mr. Adair* argued the cause orally.

*Mr. M. J. Thomas* and *Messrs. Gunn, Rasch, Hall & Gunn*, for Respondent United States Fidelity & Guaranty Company, submitted a brief; *Mr. Carl Rasch* argued the cause orally.

*Mr. John G. Brown* and *Mr. L. V. Ketter*, for Respondent National Surety Company, submitted a brief; *Mr. Brown* argued the cause orally.

HONORABLE CHARLES B. ELWELL, District Judge sitting in place of MR. JUSTICE STEWART, disqualified, delivered the opinion of the court.

This action arises out of two separate policies of burglary and robbery insurance, issued by the respective defendants to the plaintiff bank, each in the amount of $10,000, and each containing a provision that, if the assured carried other insurance covering the loss, the assured should not recover from the company a larger proportion of any such loss than the amount applicable thereto bears to the total amount of all valid and collectible insurance covering such loss. The policy of the National Surety Company was written on February 23, 1929, running to February 23, 1930, and on February 23, 1930, was renewed for one year, or until February 23, 1931, by a continuation certificate. The policy contained the provision that the statements contained in items 1 to 13 of the declaration thereinafter contained were declared to be true to the best knowledge and belief of the assured, and that the policy was issued in consideration of such statements and of the payment of the premiums. Item 6 of the declaration reads: ''All combination and time locks on all safe and vault doors will be maintained in proper working order and will be regularly used while this policy is in force, except as herein stated—no exceptions.''

Prior to October 15, 1930, the defendant United States Fidelity & Guaranty Company had in force a similar policy in like amount, expiring on that date. On September 23, 1930, the United States Fidelity & Guaranty Company forwarded a policy renewing the insurance, but this policy was returned by plaintiff, appellant here, with the information that plaintiff bank did not care to renew the insurance at that time. Thus the matter stood on October 24, 1930, when the cashier of the plaintiff bank, one Kreigh, also local agent of the United States Fidelity & Guaranty Company, notified the Helena agency of the surety company that the bank had changed its mind, and to forward a policy like the one in effect prior to

October 15, 1930. This was done the same day, the policy being dated back to October 15, 1930, running for one year, and containing substantially the same provisions as the policy of the National Surety Company. The cashier, Kreigh, made no statement of any kind of any knowledge or purported information relative to a proposed burglary or robbery of the plaintiff bank, and the defendant United States Fidelity & Guaranty Company had no knowledge of such proposed robbery.

On October 20, 1930, four days before he requested issuance of the last-mentioned policy, and one week before the robbery took place, Mr. Kreigh, the cashier, and Mr. Young, a director of plaintiff bank, received information through Mr. Rundell, also a director of the bank, and more directly through one Harrington, a nephew of Mrs. Rundell, of a threatened or intended holdup of the plaintiff bank. On October 22 or 23, 1930, Kreigh conveyed his information to Sheriff Metzel of Virginia City. On October 22 Kreigh knew that the holdup men were in town looking over the situation. Harrington during this time was in touch with the robbers, who freely discussed their plans with him, they making their headquarters at the Rundell ranch while in that vicinity. There is some dispute as to whether Harrington was working for the bank after he conveyed his first information to the bank on October 20, there being evidence that he was considered by some of the directors to be working in the interest of the bank. On October 23, when Rundell informed Kreigh that the robbers had left the ranch, Kreigh and Young went to the Rundell ranch and were informed that the plans had been changed, that it was to be "a night job," and would be "pulled" either Monday or Tuesday of the following week. Mr. and Mrs. Kreigh were to be surprised at their home, Mrs. Kreigh bound and covered with a blanket, the blanket saturated with kerosene, and candles lighted and placed at the corners of the blanket, and Kreigh taken to the bank with instructions to open the safe, and the sooner he opened it the quicker he could get back and extinguish the candles.

Information concerning the proposed robbery was communicated on October 23, 1930, to the county attorney, Mr. Blair, and by him to Karl Elling, president of the plaintiff bank, and to Mr. Bleck, cashier of the Elling State Bank at Virginia City, who was also manager of a holding company holding stock in the plaintiff bank, and confidential man of Mr. Elling.

Several conferences were held, in which Sheriff Metzel, Mr. Elling and Mr. Bleck were present, and Mr. Kreigh and Mr. Young conferred with the sheriff, and Harrington was also conferred with and consulted by some of them at various times. The sheriff stated that the men could not be arrested, as they "had nothing on them," refused the suggestion of outside assistance, and apparently convinced the people interested and in charge of the bank that the way to handle the matter was to allow the robbers to "pull the job" and then apprehend them after it was completed. Finally, the following scheme was worked out by the sheriff, acceded to by the others, and carried out except for the unfortunate conclusion: Kreigh and his wife left town. The proposal of the sheriff to place a stranger from Butte in the bank was finally rejected, and Mr. Bleck, with the knowledge and consent, if not at the request, of Mr. Elling, the president of plaintiff bank, was to be placed in the bank on the evening of Monday the 27th of October to await the robbers. Mr. Williams, the assistant cashier of the bank, was directed by the sheriff to fail to set the time-locks on either of the two safes, as was his custom, and also not to lock the vault by turning the combination, which instructions were carried out. This enabled anyone knowing the combination to open the safes. Mr. Bleck, a former cashier of plaintiff bank, knew the safe combinations. Very late in the day Mr. Bleck did protest over the necessity of anyone being left in the bank, but was overruled and carried out his part of the program.

The sheriff had posted some men, armed and deputized, including Mr. Young, a director of the bank, at points of vantage from which the operation of the robbers could be watched. The sheriff's plan was to allow the robbers "to go through with

the deal" and capture or kill them and recover the loot. Mr. Bleck stationed himself in the bank, and during the evening received a call from Harrington telling him to leave the bank, follow a designated route, and that he would be picked up by the robbers. Mr. Bleck refused to leave the bank, and at about 10 P. M. Harrington entered the bank, told Bleck to get into the vault and to do as he was told, as these fellows were "tough hombres." Almost immediately a masked man appeared, one man remaining outside. The masked man threatened Bleck with a gun, and under his direction the safes were opened by Bleck, currency, silver and securities taken, and Harrington left in charge of Bleck, while the robbers backed out of the building. On reaching the street the masked man was greeted by gun fire from an adjacent building, and went down, apparently badly hurt, and the posse rushed out only to find him gone, and some silver, a torn money bag, bloody mask and revolver in the street, indicating that the robber had been wounded but probably saved by reason of the bullets or slugs hitting the money bags and revolver. In the ensuing confusion the robbers escaped and took with them $2,048 in money and $4,300 in securities, making a total of $6,348.

The United States Fidelity & Guaranty Company disclaimed all liability by reason of concealment of facts material to the risk at the time of the application for the policy, and refused to furnish blanks for proof of loss. It returned the check given in payment of the premium on the policy. Proof of loss, however, was furnished and payment of the claim refused.

The National Surety Company furnished blanks for proof of loss, which were filled out and filed, and an investigation was made, and later that company offered a draft for one-half of the claim, together with blank forms of release to be executed, which tender was refused and this action started. This company defended on the grounds that there was no loss within the terms of the policy; that the plaintiff, through its officers and agents, were parties to the robbery; and that plaintiff bank had violated material warranties of its policy by exposing its

money and securities to unnecessary and dangerous hazards not contemplated by the policy.

At the conclusion of the trial, defendants made separate motions for directed verdict; both motions were granted; judgment was entered, and plaintiff appealed.

As different defenses were pleaded by the two defendants, we will first consider the action of the trial court in granting the motion of the defendant United States Fidelity & Guaranty Company.

Numerous errors were assigned on the admission or rejection of evidence, but the above evidence would not be in anywise changed or contradicted by the changing of any rulings of the trial court, except the two mentioned below. Appellant complains of the action of the trial court in admitting evidence relative to the date on which Mr. Kreigh telephoned the Helena office of the United States Fidelity & Guaranty Company requesting the policy, and as to the date on which the policy was actually signed, executed and mailed to the plaintiff bank. The policy itself bears date of October 15, and the plaintiff contends that it is binding on the defendant, and that the trial court erred in allowing the defendant to show that the policy was applied for, executed, and delivered on October 24. It is contended that to do so is to admit parol evidence to vary the terms of a written contract.

The ruling of the trial court was correct. It is permissible to show that a writing was executed on a date different from that appearing on its face. It is presumed that it is executed on the date set forth in the instrument, but this is made a rebuttable presumption by subdivision 23 of section 10606 of the Revised Codes of 1921. We know of no way to rebut this presumption except by evidence outside the writing itself, and this includes parol testimony. This does not vary the terms of the contract. The authorities are united on this.

The appellant also complains of the action of the trial court in permitting G. B. Eckles and Don W. Jacobus, managing officers of the United States Fidelity & Guaranty Company, to testify that the policy would not have been issued if

they had known, or been advised by appellant, of the circumstances under which the application was made. The fact so testified to was a material element of the defense pleaded; it was necessary to be pleaded and proved. If the surety company would have issued the policy had all the facts been revealed to them, then the facts concealed would not in any way have affected the issuance of the policy, and the concealment or failure to divulge such facts would have been no defense.

The date on which the policy was applied for, and on which it was executed and delivered, became material in view of the circumstances set forth in the statement of facts. The contention is that Mr. Kreigh knew of the contemplated robbery of the bank at the time of making the application, and knew something of the contemplated plan to allow the robbery to take place, and to depend upon the capture of the robbers for the recovery of the money and securities, and that because of his failure to communicate this to the surety company, there was a concealment of facts material to the risk, and that the concealment voided the policy.

Appellant contends that Kreigh, being local agent of the surety company, his knowledge became the knowledge of the surety company. It is a general rule that knowledge of the agent is imputable to the principal. But where the agent is acting in a dual capacity, as where he, though formally acting as such, is in reality acting in his own or another's interest and adversely to his principal, the rule, being based on the theory that it is the duty of the agent to communicate facts within his knowledge to his principal, has no application. (*Reid* v. *Linder*, 77 Mont. 406, 251 Pac. 157; *Benedict* v. *Arnoux*, 154 N. Y. 715, 49 N. E. 326.) In such case, if there be any presumption, it is that the agent will conceal any facts which might be detrimental to his own interest.

Section 7936, Revised Codes of 1921, provides: "An agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal."

Granting that Kreigh had permission, as agent of the United States Fidelity & Guaranty Company, to write insurance for robbery on his own bank, this would not excuse him from making full disclosure, nor excuse the concealing of facts as to extra or additional risks imposed in view of the above situation. (*Frazier* v. *Hartford Fire Ins. Co.*, 51 S. D. 40, 211 N. W. 973; *Burgess* v. *Chas. A. Wing Agency*, 139 Or. 614, 11 Pac. (2d) 811.)

We then have the proposition of the cashier of the bank, applying for insurance on behalf of the bank, with the knowledge that the risk of the surety is greater than ordinary because of a proposed holdup of which he apparently knows every detail, and the risk further increased by a fantastic scheme to allow the robbery to take place and then capture the robbers. To uphold such a contract would be to place a premium upon fraud. And it makes no difference that there may have been no active intent to defraud. The relations of the parties required the fullest disclosure of matters material to the risk, and any concealment of a material fact known to a party, increasing the ordinary risk, would be deemed in law to be fraudulent. (*Griswold* v. *Hazard*, 141 U. S. 260, 11 Sup. Ct. 972, 35 L. Ed. 678; *First Nat. Bank* v. *Clark's Estate*, 59 Colo. 455, 149 Pac. 612, 614.)

It follows that the trial court was correct in sustaining the motion of the respondent United States Fidelity & Guaranty Company for a directed verdict.

We must then consider the ruling of the trial court on the motion for directed verdict made by the defendant National Surety Company. If sustainable, it must be upon different grounds, as there was no evidence of the concealment of any material facts at the time this contract was applied for or entered into, and there could have been no knowledge of the contemplated robbery or the plans therefor at the time such contract was entered into.

The policy in question contained a declaration, item 6, as set out in the statement of facts, that the time-locks on all safe and vault doors would be maintained in working order

and regularly used while the policy was in force, without exception. This is what is denominated a promissory warranty, and relates, not to some fact in existence, but is a promise or rule of conduct to be followed by the assured in the future. Breach of a promissory warranty in an insurance policy avoids recovery. (*McKenzie* v. *Scottish Union, etc.*, 112 Cal. 548, 44 Pac. 922; *Gise* v. *Fidelity & Casualty Co.*, 188 Cal. 429, 206 Pac. 624, 22 A. L. R. 1476.)

Was the action of plaintiff bank in purposely failing to set the time-locks and lock the combination lock on the vault a breach of this promissory warranty? The appellant contends not, and relies upon the proposition that the negligence of the assured or its agents will not relieve the insurer from liability, and cites many cases to sustain this contention.

Section 8141, Revised Codes of 1921, reads: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of his agents or others." This section was not intended to absolve the insured from the performance of those acts which assured expressly covenanted to perform. (*McKenzie* v. *Scottish Union, etc.*, supra; *Standard Marine Ins. Co.* v. *Nome Beach L. & T. Co.*, (C. C. A.) 133 Fed. 636, 1 L. R. A. (n. s.) 1095.)

We are not here called upon to decide whether negligence or inadvertence in carrying out the provision relative to the setting time-locks and using combination locks would defeat recovery on the policy. To deliberately allow the vault to remain unlocked, and the time-locks to remain unset on a night when robbers were expected, in fact known to be coming, even though such steps were taken in contemplation of the ultimate capture of the robbers and return of the loot, can be classed as nothing other than the wilful act of the plaintiff, for which the statute plainly states an insurer is not liable. The plaintiff deliberately chose to rely upon a recapture of their property, rather than upon the protection afforded by the insurance policy.

It is argued that these acts were done at the suggestion, or direction, or even upon the orders, of the sheriff of the county

wherein the bank was located; but we are not referred to any authorities holding that the sheriff had the right or authority to direct the bank to place its property in jeopardy of burglary or robbery, or that the bank or its officers were in anywise bound to listen or accede to the suggestions, directions or even orders of the sheriff in that respect. Whether they had the right to expose the assets of their customers to such risk, we are not called upon to decide, but they were not entitled to wilfully increase the risk or change the contract of the surety company.

The action of the trial court in sustaining the motion for a directed verdict on behalf of the National Surety Company was correct.

The judgment, as entered and appealed from, is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, MATTHEWS and ANDERSON concur.

Rehearing denied June 26, 1933.